## SOCIETY OF EUROPEAN STAGE AUTHORS AND COMPOSERS, Inc., v. NEW YORK HOTEL STATLER CO., Inc.

District Court, S. D. New York.

April 30, 1937.

Abner J. Rubien, of New York City (Leonard Zissu, of New York City, of counsel), for complainant.

Campbell & Boland, of New York City (Charles J. Campbell, of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My judgment in this cause is that the complainant must have a decree carrying the usual injunction and giving it damages in the sum of $250 and costs, in which

will be included a reasonable counsel fee in pursuance of the provisions of section 40 of the Copyright Act (17 U.S.C.A. § 40).

I. This court gets its subject-matter jurisdiction herein from the fact that this cause is brought for an infringement of copyright.

There is not involved any question of the locus standi of the plaintiff or of the personal jurisdiction of this court over the defendant.

The parties have entered into a stipulation whereby they have agreed that the first, third, and fourth alleged causes of action in the supplemental bill of complaint should be withdrawn, and that the cause should be tried only on the second cause of action, in which it is alleged that on August 17, 1934, the defendant gave an unauthorized public performance for profit of a musical composition—a song entitled "As We Part"—of which plaintiff owns the copyright.

II. The facts involved have been stipulated, and such as are necessary for my purpose may be quoted from the stipulation as follows:

"At all the times herein mentioned complainant, Society of European Stage Authors and Composers, Inc., was and still is a corporation duly organized and existing under the laws of the State of New York and maintained and still maintains its principle place of business in the Southern District of New York, and; at all the times herein mentioned, was and still is authorized to carry on, and was and is actually carrying on the business of administering various performing, production, printing and publishing rights in copyrighted works.

"The aforesaid rights under copyrights administered by complainant are assigned to complainant by a number of foreign and American publishers and organizations, and also by various authors and composers.

"Among the American publishers thus affiliated with complainant is the music publishing house of Edward Schuberth & Co., a New York corporation, with its principal place of business in New York City. * * * the publisher of the musical composition which is involved in this action.

"In connection with the administration of the aforesaid rights, complainant enters into divers license contracts with the various users of music authorizing the public performance for profit of musical, dramatico-musical and dramatical works published or represented by it.

"At all the times herein mentioned, defendant, New York Hotel Statler Co., Inc., was and still is a corporation duly organized and existing under the laws of the State of New York, and having an office and place of business and may be found in the Borough of Manhattan, City of New York, in the Southern District of the United States District Court.

"At all the times herein mentioned, defendant, New York Hotel Statler Co., Inc., was and still is engaged in operating and maintaining and managing a hotel in New York City, known as the Hotel Pennsylvania, for the accommodation and entertainment of such members of the general public as are its guests and patrons.

"Said hotel was and is operated as a commercial enterprise for profit.

"For the entertainment of the guests and patrons in said hotel, and to promote the business of defendant, and to make said hotel an attractive and desirable place, and to attract trade and custom thereto, and in order that renditions of musical compositions and dramatico-musical works might be heard in the hotel daily by the guests and patrons desiring to hear same, defendant, among other instruments and devices, has caused to be installed and maintains in the hotel a two channel radio system.

"This 'two channel system' allows no more than two broadcasting stations to be made available to the hotel guest listeners at any one time and the selection of the two stations whose programs are to be made available to the guests, as hereinafter indicated, is accomplished through tuning in a different station on each of two master radio receiving sets.

"These master radio receiving sets receive and convert radio waves transmitted from radio broadcasting stations into audio-frequencies necessary to actuate loud speakers.

"The output of said receivers are fed into several stages of amplifying apparatus, which amplify the broadcast program in successive stages after it has been received.

"The output of each amplifier is led through a cable into regular pipe ducts (e. g. for water, gas and electricity) of the hotel. From the cable the output is fed into distribution lines or wires having

termini in some nineteen hundred (1900) individual guest rooms. The termini (or terminal strips) are enclosed and concealed in night tables in each individual guest room. Loud speakers are wired into these night tables which act as a housing for them. On the face of the night table is a small knob or switch with a designation plate above it. The figure '1' is inscribed at one extreme of the designation plate and the figure '2' at the other. In the centre, above the knob or switch, there appears the word 'off.' The figures '1' and '2' respectively designate the two channels from which radio programs can be heard.

"By turning the knob to either figure, the program from the station to which the respective master receiver is tuned, becomes immediately audible. There is no volume control in the individual guest rooms and the volume level of the programs heard in these rooms is at no time above such level as would be normally used in the average sized room, and is lower than that ordinarily heard in a private home.

"The hotel usually makes available on the two master radio receiving sets radio station WABC of the Columbia Broadcasting system and radio station WJZ of the National Broadcasting Company. If guests require a special program on some other station the hotel tunes in such station over the master receiver in place of the usual station received.

"The amplifying apparatus also contains a plug-in-microphone through which sales announcements made in the hotel, instead of broadcast material, may be transmitted to the individual guest rooms, the master radio receiving apparatus being disconnected for such use.

"The above radio system covers only individual guest rooms and does not extend to any other rooms, lobbies, lounges or restaurants in the hotel.

"All radio control equipment, exclusive of the cables, distribution wires and radio speakers in the rooms attached thereto, is installed in a separate room known as the 'control room' located on the roof of the hotel. Said control room also contains a two channel public address system consisting of microphones, amplifiers, and loud speaker equipment for use in voice reinforcement in the ballroooms, meeting rooms and private dining rooms of the hotel. This 'control room' is barred to the public and is under the charge of a radio engineer and two assistants who are regular full time employees of the hotel and whose duties consist of supervising and operating the above radio system, as well as the aforesaid two channel public address system, which latter requires the major part of their time.

"The radio service or transmission from the master receiver is continuous from 11 a. m. to midnight daily, excepting on Sunday this radio service is turned off one hour earlier. A neon blinker attached to the master receiving apparatus visibly indicates or acts as a check on the continuity of transmission. The tone of the reception may also be checked through either a loud speaker or earphones attached thereto. Sixteen hundred watts of electric power, supplied by the hotel, are consumed in the operation of this radio system.

"At all the times herein mentioned, the National Broadcasting Company owned and operated and still owns and operates radio station WJZ in New York City, New York, and was licensed by the Federal Communications Commission to operate said station as a commercial station and for profit.

"Said Company executed a contract with complainant, dated February 25th, 1934, which provides, among other things, that radio station WJZ and its other owned and operated stations may broadcast for a period of five years therefrom non-dramatic renditions of the musical compositions owned and controlled by the complainant. Said contract also provides, as follows:

" 'Nothing herein contained shall be construed as permitting the Licensee either expressly or by implication to grant to others the right to reproduce or perform publicly for profit or otherwise, by any means, method or process whatsoever, any of the said compositions or works, so broadcast, or in any way as permitting any receiver of the broadcast of any of said compositions or works to publicly perform or reproduce the same for profit or otherwise, by any means, method or process whatsoever. The Licensee shall have no right to perform or otherwise utilize any works covered under this agreement except as herein specifically granted.' * * *

"A certain witness was engaged by the complainant to register during the 17th day of August, 1934 at the Hotel Pennsylvania

and to listen to radio programs in his room at said hotel and to make a record for complainant of the musical selections which he thus heard performed.

"On the 17th day of August, 1934, at 11:30 a. m., said witness registered at the Hotel Pennsylvania, was assigned to a regular individual guest room and paid the regular rate therefor.

"At or about 11.40 a. m. said witness turned the knob or switch to that figure which made audible programs from radio station WABC, to which station's programs he listened for approximately fifteen minutes, and then he turned the knob or switch to that figure which made audible programs from radio station WJZ, to which station's programs he then listened for approximately three-quarters of an hour, or until about 12.40 p. m.

"At or about 12.15 p. m. of said day, while said witness was listening to the programs of WJZ of the National Broadcasting Company, he heard broadcast over said station a rendition of the aforesaid musical composition entitled 'As We Part.'

"Said witness checked out of the Hotel Pennsylvania at 3.40 p. m. on said 17th day of August, 1934.

"No prearrangement existed with respect to what programs or music should be broadcast by the * * * station WJZ or received by the defendant."

III. The question here involves the application to these facts of the provisions of section 1(e) of the Copyright Act, title 17 United States Code, § 1(e), 17 U.S.C.A. § 1(e), which provides, inter alia, that:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right: * * *

"(e) To perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit."

IV. What I have first to determine is whether what was done by the Hotel Pennsylvania was a public performance for profit of the plaintiff's copyrighted musical composition.

In the case of Buck v. Jewell-LaSalle Realty Company, 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266, decided April 13, 1931, the Supreme Court answered in the affirmative (283 U.S. at page 202, 51 S.Ct. 413) the following question (283 U.S. at pages 195, 196, 51 S.Ct. 410, 411) certified to it by the Circuit Court of Appeals for the Eighth Circuit, 32 F.(2d) 366, as involved on an appeal there heard and awaiting decision: "Do the acts of a hotel proprietor, in making available to his guests, through the instrumentality of a radio receiving set and loud speakers installed in his hotel and under his control and for the entertainment of his guests, the hearing of a copyrighted musical composition which has been broadcast from a radio transmitting station, constitute a performance of such composition within the meaning of 17 U.S.C. sec. 1(e) [17 U.S.C.A. § 1(e)]?"

The case just mentioned concerned the arrangement for the reception and reproduction of radio broadcasts within the La-Salle Hotel in Kansas City.

The only difference between such arrangements in the LaSalle Hotel and in the Hotel Pennsylvania is that in the former broadcast programs were reproduced in the public rooms of the hotel as well as in about two hundred of the private guest rooms [cf. Buck v. Jewell-La Salle Realty Company, 51 F.(2d) 726, 727 (C.C. A. 8), decided July 23, 1931], whilst in the Hotel Pennsylvania the master receiving sets of the hotel are connected only with the bedrooms, and a guest in a bedroom of the Hotel Pennsylvania can turn on the loud speaker, and may select as he desires either of the two programs received by the two master receiving sets of the hotel.

The counsel for the defendant contends that such control of the loud speaker in each room by the guest occupying it makes it impossible properly to contend that there is a performance by the hotel when a guest turns on the loud speaker in his room.

This argument is based on the theory that it is only the last step which counts.

I do not agree to that principle as here applied, for the reception of a broadcast program by one who listens to it is not any part of the performance thereof. Indeed, both physically and mentally it is about as far removed from performance as can well be imagined.

Therefore, I regard as without significance the differences between the physical arrangements in the LaSalle Hotel and the Hotel Pennsylvania, and, accordingly, I find that when the owner of an hotel does as much as is done in the Hotel Pennsylvania to promote the reproduction and transmission within its walls of a broadcast program received by it, it must be considered as giving a performance thereof

within the principle laid down by the Supreme Court in the LaSalle Hotel case.

Inasmuch as under the teachings of that case there was, in my opinion, a performance of the plaintiff's copyrighted song by the Hotel Pennsylvania, the questions are whether that performance was *public* and *for profit,* and thus complied also with the other two requisites for this aspect of the infringement of the copyright of a musical composition.

There is not any doubt that the locale of the performance—which I shall call, by way of convenient metaphor, an intramural broadcast—was public; for under section 40 of the Civil Rights Law of New York State, chapter 14 of the Laws of 1909 (Consol.Laws N.Y. c. 6), as amended, by Laws 1918, c. 196, as well as under the common law [cf. Waters & Co. v. Gerard, 189 N.Y. 302, 303, 319, 321, 82 N.E. 143, 24 L.R.A.(N.S.) 958, 121 Am.St.Rep. 886, 12 Ann.Cas. 397; Roberts v. Case Hotel Company, 106 Misc. 481, 175 N.Y.S. 123], an hotel is a place of public accommodation, and, in this respect, occupies a juridical status in many respects analogous vis-a-vis the public to that of a common carrier.

It is contended, however, by the defendant that in spite of this characteristic of an hotel and even if there was a performance of the plaintiff's copyrighted musical composition by the Hotel Pennsylvania, it could not properly be claimed to have been a *public* performance thereof, because it was not broadcast in any public room of the hotel, and because the loud speakers which made the program audible to guests were in each bedroom and severally under the control of the guests or guest occupying it.

I think the answer to this aspect of the defendant's argument can be found by comparing the position of an hotel making an intramural broadcast, such as was made here, with the position of the original broadcaster whose program the hotel received and reproduced.

The case of Jerome H. Remick & Co. v. American Automobile Accessories Co., 5 F.(2d) 411, 40 A.L.R. 1511 (C.C.A. 6), decided on April 9, 1925, certiorari denied (1925) 269 U.S. 556, 46 S.Ct. 19, 70 L.Ed. 409, was, I believe, the first case in which the question was raised as to whether a broadcaster of a copyrighted musical composition infringed the copyright thereof if he were not licensed to make the broadcast. It was held that he did infringe, and in dealing with the contention of the defendant there that if the listeners were separate the performance could not properly be considered public, Judge Mack said in his opinion at page 412 of 5 F.(2d): "A performance, in our judgment is no less public because the listeners are unable to communicate with one another, or are not assembled within an inclosure, or gathered together in some open stadium or park or other public place. Nor can a performance, in our judgment, be deemed private because each listener may enjoy it alone in the privacy of his home. Radio broadcasting is intended to, and in fact does, reach a very much larger number of the public at the moment of the rendition than any other medium of performance. The artist is consciously addressing a great, though unseen and widely scattered, audience, and is therefore participating in a public performance."

To like effect is the Australian case of Chappell & Co., Ltd., v. Associated Radio Co. of Australia, Ltd., [1925] Victoria Law Reports, 350, 360, 361, which was decided on June 9, 1925, and in which Judge Mack's opinion is cited.

If the principle of the Remick Case, from which I have just quoted, be applied, as I think it must be, to the microcosm of intramural broadcasting as well as to the macrocosm of general broadcasting, the defendant's hypothesis that individual reception is an alibi to a claim that its performance was public seems to me to be entirely destroyed.

The guest personnel of an hotel such as the Hotel Pennsylvania, although it shifts constantly, always constitutes a small cross-section of the public. Clearly broadcasting within the hotel walls to the cross-section of the public, then there resident, must be as much a public performance as would be broadcasting in a theatre.

That the intramural broadcasting by the hotel is not only a public performance, but also a performance for profit, is obvious, because it is one of the considerations given to the guests of the Hotel Pennsylvania for the rental of its rooms. Cf. Herbert v. Shanley Company, 242 U.S. 591, 594, 595, 37 S.Ct. 232, 61 L.Ed. 511.

Consequently, I hold that the reproduction by the hotel's master receiving sets of the electric impulses of the broadcast, and their distribution among its rooms so that all who wish may, by turning a knob,

listen to the broadcast, is a public performance for profit of the broadcast program, and is made at the hotel's risk in so far as copyrighted musical compositions are concerned.

■ The defendant, therefore, is liable for an infringement of the plaintiff's copyright unless it can justify its act under the license given to the National Broadcasting Company by the plaintiff.

V. The license given by the plaintiff to the National Broadcasting Company was an express license to broadcast solely through stations which it owned or controlled certain copyrighted musical compositions owned by the plaintiff. It was, therefore, within its rights when it used its own station WJZ to make the broadcast of the plaintiff's song "As We Part."

In view of the fact that the electric impulses broadcast by WJZ are ubiquitous within the zone reached by the power of that station, the question not unnaturally arises whether the plaintiff can properly claim an injunction and damages against a receiver of that broadcast to whatsoever use the receiver may have put it.

The license before me contained a limitation—set forth in full in the agreed statement of facts—which precluded the National Broadcasting Company, by sublicense, express or implied, from granting to others the right publicly to perform the plaintiff's copyrighted musical compositions for profit. It seems to me that the effect of the addition of this limitation to the license was merely to add emphasis to the fact that the license was given to the National Broadcasting Company solely for its own use, and hence that the limitation was a redundancy.

If I am wrong in this view of the limitation, and, in order to protect the copyright owner, such limitation is necessary on such a license as I have before me, the limitation quoted above certainly exorcises the possibility of any implied sublicense, glanced at by Mr. Justice Brandeis in a footnote to his opinion in the LaSalle Hotel case, 283 U.S. 191, at page 199, 51 S.Ct. 410, at page 412, 75 L.Ed. 971, 76 A.L.R. 1266.

In the British case of Performing Right Society, Ltd., v. Hammond's Brewery Company, Ltd. (1933), 49 T.L.R. 410, affirmed (1934) 50 T.L.R. 16, [1934] Chancery 121, and in the Canadian case of Canadian Performing Right Society v. Ford Hotel, Ltd. (1935) 2 Dominion Law Reports, 391, the facts, in essentials, were not unlike the facts in the instant case. The original broadcasters in both cases had licenses for "broadcasting for domestic and private use only," and in both cases it was held, under copyright statutes substantially like ours, that the defendants, who were owners of hotels, were guilty of infringement of the plaintiffs' copyrights in receiving broadcasts of copyrighted musical compositions and reproducing them for their guests.

It seems to me—if I may so venture to express it—that the courts in these two cases, perhaps, took more comfort than was necessary from the limitations in the licenses therein involved.

■ For when, as here, and in the cases just cited, the two conditions exist that the broadcaster has a license solely for his own performance and that there is not any privity whatever between the broadcaster and the receiver, I think that the question of copyright infringement depends, not on the broadcaster's rights, but on the receiver's acts.

Consequently, the defendant herein, which, without a license, ventured to have a public performance for profit of the plaintiff's copyrighted musical composition —howsoever it was come by and howsoever it was performed—was a trespasser on the plaintiff's private copyright domain from which its right of excluding others is plenary.

This right, however, in these days when so many simultaneous public performances for profit are possible, can only be protected by continuous vigilance, and the owner of a copyright to a musical composition should have the chance to gather royalties whilst and where he may.

■ VI. There has not been any proof of actual damages to the plaintiff in this cause. Therefore, in determining the damages to be allowed to it, I must have recourse to section 25, subd. (b), of the Copyright Act (17 U.S.C.A. § 25(b), which deals with such a situation.

This section of the Copyright Act as it applies to infringement of a copyright of a musical composition has been construed by the Supreme Court of the United States in the case of Jewell-La Salle Realty Company v. Buck, 283 U.S. 202, 51 S. Ct. 407, 75 L.Ed. 978, decided April 13, 1931—the second of the two LaSalle Hotel cases.

Under the authority of that case, I give the plaintiff damages in the sum of $250.

VII. Counsel fees may be allowed to the successful party in a copyright cause under section 40 of the Copyright Act (17 U.S.C.A. § 40).

In order to enable me to fix those fees, I will require plaintiff's counsel, on two days' notice, to serve on the defendant's attorneys and submit to me affidavits dealing with his services and disbursements. After these fees are fixed, costs must be taxed before the final decree is noticed for settlement in order that the costs, including the fees allowed, may be covered by the final decree.*

VIII. This opinion must stand as the findings of fact and conclusions of law in this cause under Equity Rule 70½, 28 United States Code, § 723 (28 U.S.C.A. following section 723); Hazeltine Corporation v. Radio Corporation (D.C.) 52 F.(2d) 504, 512; Lewys v. O'Neill (D.C.) 49 F.(2d) 603, 618; Briggs v. United States, 45 F.(2d) 479 (C.C.A. 6); Stelos Company v. Hosiery Motor-Mend Corporation (D.C.) 60 F.(2d) 1009, 1013; Id., 72 F.(2d) 405 (C.C.A. 2); Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414. Cf. also The El Sol (D.C.) 45 F.(2d) 852, 856, 857; Southern Pac. Co. v. U. S., 72 F.(2d) 212 (C.C.A. 2). And an order so providing must be included in the final decree for the plaintiff which will give the plaintiff the usual injunction and damages in the sum of $250, which will bear interest until paid.

Submit decree through the clerk's office on the usual notice after the counsel fees are fixed and the costs are taxed.

---

* By stipulation between the parties, approved by this court, the amount of $500 was fixed as covering damages for copyright infringement, costs, and counsel fees, and the final decree for the plaintiff provided accordingly for the recovery of that sum only.