**MIDWEST VIDEO CORPORATION,
Petitioner,**

v.

**UNITED STATES of America and Federal Communications Commission,
Respondents.**

**No. 20439.**

United States Court of Appeals,
Eighth Circuit.

May 13, 1971.

---

Floyd R. Gibson, Circuit Judge, concurred and filed opinion.

Harry M. Plotkin, Washington, D. C., Wayne W. Owen, Little Rock, Ark., George H. Shapiro, David Tillotson, Washington, D. C., for petitioner, Moses, McClellan, Arnold, Owen & McDermott, Little Rock, Ark., Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel.

Edward J. Kuhlmann, Atty., Federal Communications Commission, Washington, D. C., Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Alan A. Pason, Attys., Dept. of Justice, Washington, D. C., Richard E. Wiley, Gen. Counsel, John H. Conlin, Assoc. Gen. Counsel, Federal Communications Commission, Washington, D. C., for respondents.

Before VAN OOSTERHOUT, GIBSON and LAY, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Petitioner, Midwest Video Corporation, seeks review of the first report and order adopted by the Federal Communications Commission (FCC) on October 24, 1969, reported at 20 F.C.C.2d 201, and its order denying reconsideration adopted June 24, 1970, reported at 23 F.C.C.2d 825. The foundation for such orders was laid by notice of proposed rule making and notice of inquiry reported at 15 F.C.C.2d 417 relating to community antenna television systems (CATV).

Petitioner operates CATV systems in Missouri, New Mexico and Texas. Some of its systems have microwave authorization and some systems have more than 3500 subscribers. Petitioner was substantially engaged in its CATV operations long prior to the institution of the rule making proceedings here involved.

The FCC, asserting authority to do so pursuant to the Communications Act of 1934 as amended, 47 U.S.C.A. § 151 et seq., adopted: (1) Rules requiring all CATV systems with 3500 or more subscribers to produce original programs to a significant extent and to have available facilities for the production of such programs after April 1, 1971, as a condition to its right to continue to function as a CATV system. (2) Rules limiting type of programs which CATV systems may transmit upon the basis of a program of per channel charge. (3) Rules governing the program origination of all CATV systems.

Petitioner contends that Congress has not by the Communications Act or otherwise authorized the FCC to prescribe such rules. We agree with the petitioner's contention and set aside the origination rule for the reasons hereinafter stated.

The principal attack is upon the origination rule referred to at item (1) above. Section 74.1111 of the Commission's rules so far as here material reads:

"(a) Effective on and after April 1, 1971, no CATV system having 3,500 or more subscribers shall carry the

signal of any television broadcast station unless the system also operates to a significant extent as a local outlet by cablecasting and has available facilities for local production and presentation of programs other than automated services. * * * "

Cable casting is thus defined in § 74.1101:

"(j) *Cablecasting.* The term 'cablecasting' means programing distributed on a CATV system which has been originated by the CATV operator or by another entity, exclusive of broadcast signals carried on the system."

No direct authority is granted to the FCC by the Communications Act to regulate CATV systems. CATV came into existence subsequent to the enactment of the Communications Act of 1934. Consequently it is not surprising that nothing can be found in the Act or its legislative history bearing upon the intention of Congress with respect to CATV regulation. Many efforts to enact legislation covering CATV have failed to meet with success. The growth of CATV has been explosive. Courts have found the issue of the right of the FCC to regulate CATV to be extremely troublesome. The concern is not over the power of Congress to regulate CATV but over the authorization Congress has actually made.

Descriptions of CATV systems covering both off-the-air and microwave fed types, the function of CATV and the pertinent history of its development are fully discussed in the FCC reports and in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001, and Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176. See Black Hills Video Corp. v. F. C. C., 8 Cir., 399 F.2d 65. No need exists to re-cover this ground here.

CATV operations are of two types, off-the-air and microwave. Off-the-air systems capture television and radio signals off the air by means of a high antenna convert or modify the signal by electronic equipment and carry the converted signal to subscribers for a fee by coaxial cable and wire. Microwave systems use amplifying devices to bring distant signals over the air to the receiving end of its station from which it conveys the signal to customers in the same manner as off-the-air systems. The FCC first asserted jurisdiction over microwave fed systems and later asserted jurisdiction over off-the-air systems. The courts appear to attach no significance to the distinctions between off-the-air microwave fed systems. See Southwestern Cable Co., supra, p. 167 of 392 U.S., 88 S.Ct. 1994.

In any event the authority of the FCC in our present case does not appear to turn on the competing use of the spectrum by microwave fed operations. The rules are applied in the same manner to both off-the-air and the microwave operations.

In *Southwestern Cable Co.,* the Supreme Court upheld the right of the FCC to require CATV systems to carry signals of local television stations, the non-duplication of local programing and the restriction of CATV transmission of distant signals into the one-hundred largest television markets (except for such services as existed on February 15, 1966).

Such authority was predicated upon 47 U.S.C.A. § 152(a) making the provisions of the Act applicable to "interstate or foreign communication by wire or radio" and the broad statements of purposes in 47 U.S.C.A. § 151 directing the FCC to "make available * * * to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service. * * * " Reliance is also placed on § 153(a) and (b) defining wire and radio communications, and §§ 307(b) and 303(f) relating to providing equitable allocations of broadcasting facilities.

The Court in *Southwestern Cable* by way of limitation states:

"There is no need here to determine in detail the limits of the Commission's authority to regulate CATV. It is enough to emphasize that the authority

which we recognize today under § 152 (a) is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting. The Commission may, for these purposes, issue 'such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law,' as 'public convenience, interest, or necessity requires.' 47 U.S.C. § 303(r). We express no views as to the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes." 392 U.S. 157, 178, 88 S.Ct. 1994, 2005.

The compulsory origination rule here goes far beyond the regulatory power approved in *Southwestern Cable Co.* The traditional CATV operation differs greatly from that of originating programs. For origination, substantial investment in entirely new and different equipment is required. Additional personnel is needed for program origination. The record, as the Commission impliedly concedes, provides no accurate estimate of the increased cost that would be involved. See paragraph 25 of the first report.

The Commission recognizes that smaller CATV operations could not afford to provide origination services and concedes that there is no consensus as to the appropriate cutoff point of ability to provide origination. The Commission then arbitrarily adopts 3500 subscribers as the cutoff point.

In paragraph 24 of the first report, the Commission cites instances where CATVs with more than 3500 subscribers have lost money on origination. Only approximately 10% of the existing CATV operations now have more than 3500 subscribers. At paragraph 4 of its first report, 20 F.C.C.2d p. 20, the Commission states:

"4. Those commenting on behalf of CATV interests generally agreed that CATV program origination serves public interest and should be encouraged, though they almost uniformly opposed our proposal to require origination as a condition for the carriage of broadcast signals (notice, pars. 15–16). On the other hand, broadcast interests—particularly those without CATV holdings—generally urged that program origination should be prohibited altogether, or at least restricted to local originations of the public service type, and that advertising should be barred. It is claimed that this is necessary to prevent potential fractionalization of the audience for broadcast services and a siphoning off of program material and advertising revenue now available to the broadcast service."

Thus it appears that both the CATV interests and conventional broadcasters are opposed to compulsory CATV origination.

In *Fortnightly*, the Supreme Court states that television results from the combined activity of broadcasters and viewers. After carefully analyzing the function of CATV, the Court holds that the CATV operation falls on the viewers' side of the line, and then goes on to say:

"Essentially, a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's television set. It is true that a CATV system plays an 'active' role in making reception possible in a given area, but so do ordinary television sets and antennas. CATV equipment is powerful and sophisticated, but the basic function the equipment serves is little different from that served by the equipment generally furnished by a television viewer. If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set. The result would be no different if several people combined to erect a cooperative antenna for the same purpose. The only difference in the case of CATV is that the antenna system is erected and

owned not by its users but by an entrepreneur.

"The function of CATV systems has little in common with the function of broadcasters. CATV systems do not in fact broadcast or rebroadcast. Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public and carry them by private channels to additional viewers. We hold that CATV operators, like viewers and unlike broadcasters, do not perform the programs that they receive and carry." 392 U.S. 390, 399–401, 88 S. Ct. 2084, 2089.

The Court went on to hold that CATV operators, like viewers, did not perform programs and hence incurred no obligation under copyright law.

The *Fortnightly* Court also recognizes the useful public service performed by CATV in making television reception possible in certain areas.

The *Fortnightly* holding that the CATV operator is not a broadcaster and that the operation falls on the viewers' side of the line affords strong support for the petitioner's contention that the Communications Act does not authorize the FCC to compel program origination. We find no balance of public interest which requires stretching the Act to confer such authority. In so holding, we are not passing on the power of the FCC to permit CATVs to originate programs and to prescribe reasonable rules for such CATV operators who voluntarily choose to originate programs.

It is of some significance that Congress has not authorized the FCC to license CATV operation and that the Commission has not assumed authority to do so. In its order denying rehearing, it states:

"7. We note also other requests by several parties that we deal with CATV on a more comprehensive basis at this time, covering such issues as licensing, whether origination by the CATV operator should be permitted on more than one channel, regulation of common carrier operations, reporting requirements, and technical standards. We are not persuaded that all of these questions need be resolved before we proceed with the basic determinations made in the First Report and Order of October 27, 1969. CATV originations are still in their infancy and, so far as we know, common carrier operations are still in the future. These various issues are not being forgotten." 23 F.C.C.2d, 829.

CATV operators obtain their licenses or franchises from state regulatory boards or municipalities. Congress has made no attempt by legislation to preempt such authority. The Commission has not asserted a right to license CATV operators. Problems arise with respect to encroachment on state and municipal rights to franchise CATV. The record affords no basis for determining whether the local franchises granted to CATV operators include or exclude the right to cablecast. In sharp contrast, Congress has preempted the field of licensing radio and television operators. Provisions with respect to periods for which licenses may be issued and standards to be applied in granting licenses are spelled out in the statute.

■ It is established that cablecasting involves no use of the spectrum. Cablecasting involves a new and distinct use of electronic communication which does not utilize in any way the radio frequency spectrum of the broadcast signals regulated by the Commission. The Commission's power to adopt rules requiring cablecasting to the extent that it exists must be based on the Commission's right to adopt rules that are reasonably ancillary to its responsibilities in the broadcasting field. Cablecasting's link to television is primarily economic. As held in *Fortnightly*, broadcast signals are dedicated to the public by broadcast studios and the right to receive and distribute

them may be exercised by any one with capacity to capture the signals.

■ The Communications Act confers no authority to the Commission to favor one mode of electronic communication over another.

As stated by the United States in its brief, the public interest standard of the Communications Act incorporates the basic national policy in favor of competition as expressed by the antitrust laws in areas such as this where the competition does not relate to the use of the radio frequency spectrum.

In our view, the Commission's origination requirement goes far beyond the regulation of the use made of signals captured by CATV as authorized in *Southwestern Cable Co.* Petitioner is required as a condition to its right to use the captured signals in their existing franchise operation to engage in the entirely new and different business of originating programs. Entering into the program origination field involves very substantial expenditures. Costly equipment must be purchased. Personnel must be employed who are skilled in photography, sound production, program planning and direction, and in performing. Such expense will often prove burdensome because of the limited area the program will reach. See Federal Regulation of Cable Television: The Visible Hand, Chazen and Ross, 83 Harvard L.Rev. 1820.

A high probability exists that cablecasting will not be self-supporting and that the burden thereof would likely cause substantial increase in the amount that subscribers are required to pay for CATV service and in some instances may drive the CATV operators out of business.

In Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101, the Court held that the State had a right for proper reasons to grant or withhold from its citizens the right to use its highways for private purposes, but that the State could not condition the grant of such right upon the user becoming a common carrier. The Court said:

"Having regard to form alone, the act here is an offer to the private carrier of a privilege, which the state may grant or deny, upon a condition which the carrier is free to accept or reject. In reality, the carrier is given no choice, except a choice between the rock and the whirlpool—an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden. \* \* \*

"It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights." 271 U.S. 583, 593–594, 46 S.Ct. 605, 607.

See Interstate Commerce Commission v. Oregon-Washington R. & Nav. Co., 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588; Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 10 Cir., 100 F.2d 770, reversed on other grounds, 309 U.S. 4, 60 S.Ct. 215, 84 L.Ed. 447. Such principle applies to our present situation.

FCC's reliance upon the end use theory set out in Federal Power Commission v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377, is misplaced. The Court there held that FPC could consider the end use of the gas in exercising its jurisdiction over gas transmission but then goes on to say: "The Commission cannot order a natural gas company to sell gas to users that it favors; it can only exercise a veto power over proposed transportation and it can only do this when a balance of all the circumstances weighs against certification." 365 U.S. 1, 17, 81 S.Ct. 435, 444.

In *Southwestern Cable Co.*, the FCC took the position that the regulations imposed were necessary to prevent deleterious competition by CATVs which

would financially cripple conventional licensed broadcasters and discourage prospective broadcasters, and that such regulation hence was in the public interest. The FCC has now changed its position and holds the public interest requires CATV origination because broadcasters in some areas will not provide adequate service. Competition with conventional television operators is encouraged by requiring cablecasting and permitting advertising with certain limitations, all over the strong protest of licensed broadcasters. The Commission report itself shows that upon the basis of the record made, it is highly speculative whether there is sufficient expertise or information available to support a finding that the origination rule will further the public interest. There is a distinct possibility that such requirement may force CATV operators out of business thereby making unavailable the recognized useful service performed by CATVs in areas where distance or topography impair favorable reception of television signals.

■ We hold that the FCC is without authority to impose the program originating rule on existing cable television operators.

Petitioner has also challenged the pay TV rules relating to program origination and the rules governing program origination. Petitioner has stated that it has no intention or desire to cablecast. Since we have held that petitioner cannot be compelled to cablecast, it would appear that petitioner has no standing to challenge such rules. Moreover, some rules are still before the Commission on petitions for reconsideration filed by other parties. Under such circumstances, we pretermit consideration of the validity of the rules promulgated with respect to CATV operators who voluntarily elect to cablecast.

The order of the FCC requiring CATV operators to originate programs as a condition to the continuation of their CATV operations is set aside.

FLOYD R. GIBSON, Circuit Judge (concurring).

I concur in the result. I think the FCC has authority over CATV systems but that the order under review is confiscatory and hence arbitrary.

It is certainly in the public interest for the FCC to regulate CATV systems which partake of a monopoly in disseminating and transmitting TV programs in certain areas. Undoubtedly their operations have a substantial effect on licensed broadcasters; and from the public viewpoint they provide a real service in offering the public a wider variety of programs with improved reception. Whether they do this with less annoying and irritating commercials I do not know. It appears to the casual viewer that the commercials have over the years become increasingly longer in length, more frequent and sometimes louder so that some news programs and some motion picture programs amount to little more than a series of disjointed commercials. It is thus uncertain whether the CATV systems would give the public any relief from the ever-increasing commercials; and, of course, if the CATV systems were allowed to inject their own commercials, this would constitute an additional irritation and legal trespass upon the viewers' time. This, however, is a matter that must await future development.

*Southwestern Cable* recognized the CATV systems' impact on TV broadcasting and clearly upheld the Commission's authority to meet the issue in that case, while noting that the extent of the Commission's authority had not yet been judicially determined. Congress, of course could set out the limits but has not seen fit to do so and for a variety of reasons might not act upon the problem. The FCC, therefore, will have to regulate the development of this new and important electronic development in a manner best suited to the public interest, as the need arises and the opportunity presents itself.

The *Fortnightly* case of course only considered the CATV systems as they

are now constituted as a disseminator and viewer of programs rather than an originator or broadcaster. In this light CATV does not violate the Copyright Act of 1909. The only import of this decision is that it does definitely classify the CATV systems as transmission facilities rather than broadcasting facilities. Now the FCC, by imposing originating responsibility of even a limited type on certain CATV systems, changes their essential operation from that of a pure transmission facility to that of at least a limited broadcast facility. Then once assuming a broadcast function, the CATV systems would have to be further regulated in the public interest by the FCC; and of course local origination in the CATV systems could eventually open up many avenues for mass media communication. There is, and the majority opinion does not rule out, the possibility that optional or voluntary compliance with the FCC order might take place.

While it appears to me that the FCC's rule on limited origination is in the public interest, it does not appear that the FCC has shown a sufficient basis for exercising its authority at this time. The Commission does have broad authority under 47 U.S.C. § 151, "to make available * * * a rapid, efficient, Nationwide * * * communication service with adequate facilities at reasonable charges"; but the Commission's particular order on origination, at this time at least, would be extremely burdensome and perhaps remove from the CATV field many entrepreneurs who do not have the resources, talent and ability to enter the broadcasting field. The order is thus oppressive and arbitrary at this time, but that does not mean that with the continued development of the CATV systems and with the systems' impact upon broadcasting, it might not in the future be advisable and in the public interest to compel origination of local programs. It would appear to me that the CATV systems should be permitted to remain basically a transmission facility at this time, with allowance for the

441 F.2d—84

CATV systems to experiment on origination without being compelled to do so.

Another difficulty is in now assessing future development of the CATV systems' operation. The FCC is to be commended in attempting to anticipate how this electronic phenomenon can and should be used in the public interest. This can be done by allowing experimentation with voluntary origination without placing a burden that to some would be confiscatory.