**COLUMBIA BROADCASTING SYSTEM, INC., et al., Plaintiffs,**

v.

**TELEPROMPTER CORPORATION** and **Conley Electronics Corporation, Defendants.**

**No. 64 Civ. 3814.**

United States District Court, S. D. New York.

May 2, 1972.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, by Asa D. Sokolow, Renee J. Roberts, James K. Nevling, Jr., Harry Olsson, New York City, for plaintiff Columbia Broadcasting System, Inc.

Marshall, Bratter, Greene, Allison & Tucker, by Royal E. Blakeman, Bertram Weidberg, New York City, for plaintiff Calvada Productions.

Alexander & Green, by Alfred C. Moran, New York City, for plaintiff Jack Chertok Television, Inc.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, by Bernard Buchholz, New York City, for plaintiff, Dena Pictures, Inc.

Cleary, Gottlieb, Steen & Hamilton, by Robert C. Barnard, R. Michael Duncan, Washington, D. C., Katz, Schier, Rosensweig & Sindle, by Walter C. Schier, David Z. Rosensweig, New York City, for defendants.

OPINION

MOTLEY, District Judge.

I. *Introduction*

Four years ago, in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968) (*Fortnightly*), the Supreme Court developed the test by which the copyright liability of community antenna television (CATV) systems was to be

measured.[1] Progress in the CATV industry has brought us the inevitable sequel to that case. We are asked here to decide whether specific differences between defendants CATV's and those in *Fortnightly*—most importantly, transmittal of broadcast signals from stations hundreds of miles away and program origination—make defendants liable for infringement of plaintiffs' copyrights.

Defendants Teleprompter Corp. (Teleprompter) and Conley Electronics Corp. (a wholly-owned subsidiary of Teleprompter) own a large number of CATV stations throughout the United States. Plaintiff Columbia Broadcasting System (CBS) operates a television broadcasting network, furnishing programs to approximately 200 affiliated television stations. CBS owns copyrights on certain programs, and, in addition, licenses programs from the other plaintiffs who likewise produce television programs. Defendants' CATV systems receive broadcast television signals embodying plaintiffs' copyrighted material and transmit those signals to the homes of their subscribers.

The parties agreed that the activities of five of defendants' facilities located in different parts of the country would best illustrate the nature and extent of defendants' activities for purposes of decision here. These five facilities are located as follows: Elmira, New York; Farmington, New Mexico; Great Falls, Montana; New York, New York; and Rawlins, Wyoming. The activities of these five stations, including how and from where they received plaintiffs' copyrighted materials, form the basis of a lengthy stipulation of facts. It is only the legal significance of those facts which forms the core of this dispute.

It is also stipulated that none of defendants' stations had licenses under the copyrights from plaintiffs or from the television broadcast stations around the country which broadcast the plaintiffs' programs over-the-air, and the licenses granted by plaintiffs to stations which broadcast their programs did not authorize carriage of the programs by CATV systems.

The ultimate question before us is whether defendants "performed" plaintiffs' works within the meaning of § 1 of Copyright Act. 17 U.S.C. § 1. In *Fortnightly*, the facts of which will be stated below, the Court addressed the issue of whether CATV's perform. Recognizing that "[t]elevision viewing results from combined activity by broadcasters and viewers," it held that broadcasters perform while viewers do not. The CATV system in *Fortnightly*, the Court concluded, fell on the viewer's side of the line and hence did not perform. This conclusion was reached by analyzing the ". . . function that CATV plays in the total process of television broadcasting and reception"; that is, whether the CATV system functioned more like a viewer or more like a broadcaster. Comparing the function of the CATV system before it to that of both the viewer and his equipment and the broadcaster, the Court found the function of CATV more similar to the former.

It is plaintiffs' contention that defendants' five CATV systems engage in

---

1. "CATV" is the term generally applied by the Federal Communications Commission to facilities which receive signals over the air from television stations, modify them and distribute them by wire or cable to subscribing members of the public who pay for such service. 47 C.F.R. § 74.1101(a). The Supreme Court has also defined and applied this term. See United States v. Southwestern Cable Co., 392 U.S. 157, 161–163, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Fortnightly Corp. v. United Artists, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). The CATV industry is also popularly known as "cable TV", "cablecasting", or even "broadband communications". By its tone, the designation "community antenna television" suggests a prejudgment of the issues in this case, implying as it does that CATV is no more than an antenna owned by the community. Nevertheless, because of its widespread use in at least the authoritative legal literature, we shall use "CATV" when referring to defendants' operations here.

activities different from those of the CATV systems in *Fortnightly*, placing defendants' systems on the broadcaster's side of the line. Specifically, the following activities are said to have given defendants' CATV systems the function of broadcasters: 1) program origination, 2) the importation of distance signals, 3) selection of programs, 4) microwave transmission, 5) interconnection with other CATV stations, 6) advertising, and 7) sale of commercials. These activities, plaintiffs charge, were either not performed by the *Fortnightly* systems or were performed to a significantly lesser degree. Singly or together, plaintiffs suggest, these differences amount to a difference of function between defendants' systems and those in *Fortnightly*.

Not surprisingly, defendants stress the similarities between their operations and those of the *Fortnightly* systems. They further contend that, regardless of whatever else their stations do, with respect to plaintiffs' programs Teleprompter is conducting a reception service identical to the one in *Fortnightly*.[2]

We are thus faced with the question of the extent to which defendants' operations differ from those of the CATV systems in *Fortnightly*, and whether these differences cause defendants to function as broadcasters, therefore "performing" plaintiffs' works within the meaning of the Copyright Act. For the reasons set forth below we find that defendants have not performed plaintiffs' works in violation of the Copyright Act. Defendants are therefore not liable for infringement of copyright.

## II.  *Findings of Fact*

Since many of the facts in this case were stipulated by the parties, these findings will treat only the ultimate facts relevant to the decision.

### A.  *Prior Proceedings*

This action was commenced on December 11, 1964. At that time *Fortnightly* was pending before Judge Herlands in this District. Efforts to consolidate this case with *Fortnightly* for purposes of trial or appeal were unsuccessful, and by agreement of the parties proceedings in the instant case were stayed pending the ultimate decision in *Fortnightly*. Plaintiffs were granted permission to file supplemental complaints on December 15, 1969 and May 17, 1971 to include allegations concerning events up to March 31, 1971. By the pre-trial order of October 23, 1970, trial of the case was divided into stages. The first stage, which this opinion addresses, is the trial of the issue of whether there was an infringement of copyright. A trial to the court was held from September 21 through 30, 1971.

### B.  *Plaintiffs*

CBS as a regular part of its business creates programs for television and acquires other programs. These programs are broadcast by television stations which are affiliates of the CBS Television Network (an unincorporated division of CBS); many of them are later placed in syndication—licensed to individual television stations for broadcast.

Jack Chertok Television, Inc., Calvada Productions and Dena Pictures, Inc. are independent program packagers which create television programs that are furnished to networks and independent television stations.

### C.  *Defendants*

Teleprompter Corp. is a New York corporation widely engaged in CATV activities. Conley Electronics Corp., an Illinois corporation, is a wholly-owned subsidiary of defendant Teleprompter.

Defendants' CATV systems, five of which were the subject of the evidence at trial, operate generally as follows. Homeowners who subscribe to CATV pay an installation fee and a monthly charge. The monthly charge does not vary with the amount of time CATV is used or with any particular programs watched.

2.  Defendants raise several other defenses we need not discuss at this point.

A coaxial cable links the homeowner's television set to the CATV facility. By means of this connection, homeowners receive two general types of programming on their sets. One is programming originated by the CATV systems themselves and carried by the cable. The other type is programming received off-the-air by CATV receivers which has been broadcast by "regular" TV broadcast stations. Frequently, the homeowner could not receive these signals via his rooftop antenna.

All of the five CATV's have the capacity to carry twelve channels to subscribers, except New York, which has a 25-channel cable link to some subscribers. None of the CATV's uses its full complement of available channels.

D. *Origination*

As mentioned above, Teleprompter's systems receive signals from television broadcast stations, modify the signals, and then carry them to subscribers' homes by coaxial cable. In addition, defendants' systems originate their own programs. This is done by transmitting programs live, on videotape or on film from the CATV station on channels not then being used for the received programs.

Some of the origination consists of a camera scan of time and weather information, printed messages, stock and news tickers, and program listings—what may be called "automatic origination."

By 1969, all five of the stations were transmitting "automatic" origination, often consisting of time and weather information, virtually 24 hours a day.

In addition to this automatic origination, the stations carry varying amounts of other program origination. At the low end of the scale, the Elmira system occasionally originates educational programming from a studio located in a city school. This material appears on the same channel as the automatically originated programs, replacing the time, message and weather scan during that period. Aside from these educational shows, the only origination by the Elmira station is "automatic."

The Great Falls, Rawlins and Farmington stations originate more non-automatic programming than Elmira but less than New York. Though neither Great Falls nor Rawlins apparently originated any programming of this nature in 1964, by 1969 both were transmitting an average of ten hours a week besides time, weather and message scans. Farmington originated an average of four and a half hours a day, seven days a week in 1964; three hours a day, five days a week in 1969; and four hours a day, seven days a week in 1971.

New York City originated approximately forty hours a week of "non-automatic" programming during June 1969. By March 1971 this figure had grown to seventy hours a week.

Programs originated by the Great Falls, Farmington, New York and Rawlins systems have a wide range of content. Though the emphasis varies in different cities, with a large amount of local coverage by all systems, the kinds of programs originated by these four CATV systems are generally similar to those normally broadcast by television stations. Thus, Teleprompter originates news, sports and weather reports, documentaries, educational and religious shows, discussions, interviews, bingo, sports events, children's shows, movies and entertainment films.

The number of hours of program origination is in all cases substantially less than the number of hours of broadcast programming transmitted by the CATV systems.

In originating programming some Teleprompter personnel perform tasks similar to those performed by people involved in broadcasting television programs. Some of the equipment used by the Teleprompter stations to originate programs is also used by broadcast stations.

E. *Distant Signals*

Since "[t]he effective range of the broadcast is determined by the combined

contribution of the equipment employed by the broadcaster and that supplied by the viewer," (*Fortnightly*, 392 U.S. at 398, 88 S.Ct. at 2088), it is impossible to define a precise line between a "distant" and a "local" signal. The term is applied here only to connote a distinction between signals ordinarily receivable by rooftop or tower-mounted antennas and those that are not. The plaintiffs, at least, place a great deal of importance on this difference.

All the Teleprompter's CATV systems except New York receive and carry to subscribers signals not ordinarily receivable either by house-top antennas or both house-top and tower-mounted antennas. These systems are outside the "Grade B" contour of the stations whose signals they receive and carry.

> "The Grade B contour of a television station is the boundary of a hypothetical area at whose outer limits television reception of 'a quality acceptable to the median observer' is expected to be available at least 90 percent of the time at the best 50 percent of the receiver locations, based on expected field intensities and certain assumptions as to the nature and height of the receiving antenna, and the capabilities of the television set. For the Grade A contour the pertinent figures are 90 percent of the time and the best 70 percent of the locations. These predicted contours are plotted on the basis of propagation charts and rules set forth in 47 C.F.R. 73.684." (Stipulation No. 1, ¶ 60.)

In most instances the signals are received in the locale where they were broadcast by a receiving antenna. The signals are then carried by microwave transmission, sometimes hundreds of miles, to a microwave receiving station. From there the signals would be carried by cable, eventually to subscribers' homes.

Teleprompter's Farmington, New Mexico and Great Falls, Montana systems best illustrate this importation of distant signals. Farmington lies 144 miles from Albuquerque, New Mexico. Due to the distance and rough topography between the two cities, television reception in Farmington of Albuquerque stations directly off-the-air by house-top or tower-mounted antennas is not feasible. Farmington CATV erected off-the-air receiving antennas on Huerfano Mesa, an elevated point about thirty miles from Farmington. Signals from the Albuquerque stations were received there, carried by microwave to the Farmington system's building in Farmington, and then to subscribers by cable.[3] Signals from a station in Durango, Colorado were also received at Huerfano Mesa and carried by Farmington CATV.[4] Though Durango is only 43 miles from Farmington, mountains between the two cities prevent reception in Farmington by house-top antennas. Farmington is within the "Grade B" contour of the Durango station.

Beginning in November 1970 the Farmington CATV received and distributed signals of four television stations in Los Angeles, California, in addition to those stations mentioned above.[5] Farmington is over 600 miles from Los Angeles, so off-the-air reception of the Los Angeles stations by either house-top or tower-mounted antennas is impossible. Signals of the Los Angeles stations were received off-the-air by antennas forty-seven miles from Los Angeles. They were then carried by microwave *via* twenty-three steps over a roundabout, 1300-mile route to Farmington.

It should also be noted that translators owned by the San Juan Non-Profit TV Association serve the Farmington area. The Association's operations are supported by voluntary contributions from Farmington residents. A trans-

3. The stations are KGGM–TV (a CBS affiliate), KOB–TV, KNME–TV, and KOAT–TV.

4. KREZ–TV (a CBS affiliate).

5. The stations are KTLA–TV, KTTV–TV, KIIJ–TV, and KCOP–TV.

lator receives signals from a television broadcasting station, converts the carrier waves of the television signals to a new carrier frequency, amplifies them, and broadcasts them into the air. The translators in Farmington received three VHF stations located in Albuquerque and rebroadcast them on UHF frequencies.[6] Farmington residents could then receive the signals on housetop antennas. CBS and its Albuquerque affiliate, KGGM–TV, gave written permission for rebroadcast by the Association's translators.

The Great Falls CATV imports distant signals by a similar method of receiving the television broadcasts off-the-air near their source and carrying them by microwave to Great Falls. Signals are received in Great Falls from Spokane, Washington (226 miles); Lethbridge, Canada (163 miles); Salt Lake City, Utah (466 miles); and Helena, Montana (71 miles).

### F. *Program Selection*

It appears that all five CATV systems carry every television broadcast station operating within their own areas. That is, any station a resident can receive by house-top antenna will also be brought to him over cable by his local CATV system. In addition, as we have seen, in all cities but New York a subscriber receives other, more distant, stations.[7]

Where they import distant signals, as described above, Teleprompter's systems make a decision about which stations should be received. Teleprompter has freedom to choose which signals from other cities to receive and transmit to each locale.

With possibly one exception, the Teleprompter CATV systems receive the signals of the television stations they carry continuously, and distribute them without editing or deletion, except for deletion of the signals of distant stations as required by the FCC's nonduplication

rules. The one possible exception is the Farmington CATV, which for a period carried the signals of KREZ–TV in Durango, Colorado only in the evening hours.

Teleprompter's systems do not otherwise choose the sequence or content of programs they receive and carry to subscribers. Broadcasters determine the nature of programs to be viewed and the times they will be shown.

A viewer with an ordinary television set, of course, directly chooses the programs to be seen from those made available to him by broadcast and CATV.

### G. *Microwave*

As mentioned above, Teleprompter uses microwave transmission to carry signals from its receiving antennas to its various local systems. Microwave systems beam signals from a microwave transmitting antenna to specific microwave receiving antennas; these signals cannot be received with a television antenna. With one exception these transmitters send signals from one discreet point to another single specific location. That exception is a device called an Amplitude Modulated Link used by Teleprompter's New York facility which sends signals from one transmitter to two receiving points simultaneously.

In some cases Teleprompter owns the microwave equipment it uses (New York, some in Farmington); in others the microwave equipment is owned by an independent corporation (Elmira, some in Farmington and Great Falls). In all cases microwave serves the same function as cable in carrying signals from one point to another within the CATV system.

### H. *Interconnection*

Teleprompter purchased the rights to carry to its subscribers the February 25, 1964 and May 25, 1965 heavyweight

---

6. The stations are KGGM–TV, KOB–TV, and KOAT–TV.

7. The New York CATV's franchise from the City of New York specifies the television broadcasting stations to be carried by the CATV system.

championship fights between Sonny Liston and Muhammed Ali. The fights were carried live to closed circuit theatres by an independent company and to Teleprompter's CATV systems in Farmington, Elmira and Great Falls by AT&T facilities. Defendants' CATV's were linked to the nationwide AT&T circuits carrying the signals. No additional or separate charge was made to subscribers for viewing the fights.

Teleprompter's New York CATV is connected by a microwave link to the two other CATV systems in New York City, as required by its franchise agreement with the City of New York.

## I. *Advertising*

Teleprompter specifically advertises its originated programs in an effort to attract subscribers. It also advertises the fact that subscribers can receive distant signals that are otherwise unavailable. It cannot be said either that the originated programs are publicized only to attract subscribers to a "basic" reception service, or, on the other hand, that the received programming is advertised in order to promote the "basic" sale of originated programs. Teleprompter's systems sell one basic service which includes both original programming and programming received off-the-air from broadcast stations. Teleprompter would be most likely to emphasize in its advertising whatever it thought would convince consumers to purchase this one service.

## J. *Sale of Commercials*

Teleprompter's New York CATV system sold commercials for its original coverage of sporting events from Madison Square Garden, commencing on January 1, 1970. These commercial messages consisted of two ten-second "billboards" before and after the event (identifying the sponsor) and two 60-second commercial announcements during the program. The sponsor paid a total of $300 for each sporting event. Plaintiff introduced evidence that Teleprompter intends to increase its sales of commercials in the future, but during the period covered by the pleadings in this case, no other commercials than these were sold.

## III. *Conclusions of Law*

Our point of departure in determining Teleprompter's liability under the Copyright Act is the Supreme Court's decision in *Fortnightly*. As mentioned above, *Fortnightly* held that the copyright liability of CATV "depends upon a determination of the function that CATV plays in the total process of television broadcasting and reception," (at 397, 88 S.Ct. at 2088). Finding that television viewing results from the combined activity of broadcasters and viewers, the Court concluded that broadcasters perform while viewers do not. Our task, as the parties recognize, is to decide whether Teleprompter's systems "function" as broadcasters or as viewers.

Though it found the CATV systems before it to be on the "viewer's side of the line" (at 399, 88 S.Ct. 2084), the *Fortnightly* Court did not delineate the "functions" of a viewer and his receiving equipment. Rather, it analogized the function performed by CATV to that of "a well-located antenna with an efficient connection to the viewer's television set." *Id.* Both "received and delivered" electronic information (at 399, 88 S.Ct. at 2089 n. 27). Whether this well-located antenna was owned by one homeowner, several homeowners or an entrepreneur did not affect its function in the Court's view.

The Court did set forth the important functions of broadcasters and compared them with the functions of the *Fortnightly* CATV systems:

"Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive

programs that have been released to the public and carry them by private channels to additional viewers." (citations omitted) (at 400, 88 S.Ct. at 2089).

Other distinguishing features of broadcasters were added in a footnote. Broadcasters sell their time and facilities to sponsors while CATV's do not. CATV's, on the other hand, charge the public for the right to view their offerings; broadcasters do ˜not. Unlike broadcasters, CATV's have no influence on program content and arrangement. [at 400, 88 S.Ct. 2084, n. 28, citing Intermountain Broadcasting & Television Corp. v. Idaho Microwave, Inc., 196 F.Supp. 315, 325 (D.Ida.1961)]

The Court's explication of the functions of broadcasters and viewers provides only the broadcast guide to analyzing the function of the CATV systems before us.[8] *Fortnightly* did not make clear, for example, how many functions common to broadcasters a CATV system must fulfill for it to fall on the broadcaster's side of the line or, indeed, the extent an operation need be carried on for it to be found a "function." Nor does *Fortnightly* deal with instances where a CATV system simultaneously performs some functions of a viewer and some of a broadcaster, as in the case before us.

Since under *Fortnightly's* functional analysis test, the *Fortnightly* CATV systems functioned as viewers and consequently fell on the viewer's side of the line, our approach must be to compare *Fortnightly's* CATV's with the ones before us in order to isolate the differences between the two. We shall then explore whether those differences, singly or in combination, cause Teleprompter's CATV's to "function" so differently from those in *Fortnightly* as to place Teleprompter on the broadcaster's side of the line.

At the outset we can dispense with certain minor features of Teleprompter's CATV's that do not effect a significant change in function, though they did not exist in *Fortnightly*. These features are the use of microwave, interconnection, advertising, and the sale of commercials. Plaintiffs contend that defendants' CATV's are operating like broadcasters by using microwave, since microwave transmits signals through the air. Broadcasters propagate signals over-the-air, the argument goes; and since the microwave transmitters used by Teleprompter do also, Teleprompter, we are told, is functioning as a broadcaster. However, a broadcaster sends out signals to the public, while, as we have found, Teleprompter uses microwave to carry signals from one of its facilities to another; no homeowner receives Teleprompter's microwave transmission. Its use of microwave is thus completely analogous to the use of cable as a connecting carrier. Not every over-the-air transmission of signals by electromagnetic energy is a broadcast, human speech being just one example.

Nor does interconnection of several Teleprompter CATV's with closed-circuit theaters for the Liston-Ali fights make these CATV systems into a broadcast network. This interconnection occurred on two separate, temporary and special occasions. Teleprompter's CATV's were interconnected only in the sense that several of them were linked to the same independent, nationwide circuits. Whatever this brief interconnection may portend for the future, it does not transform defendants' present CATV systems into a broadcast network as plaintiffs suggest.

Defendants' advertising efforts are somewhat similar to those of the *Fortnightly* systems. One CATV system in that case advertised that it afforded access to a greater number of channels

---

8. Justice Fortas stated in his *Fortnightly* dissent: "The vague 'functional' test of the meaning of the term 'perform' is . . . unsatisfactory." (392 U.S. at 407, 88 S.Ct. at 2093). See also Comment, The Copyright Law and Its Relevance to CATV, 19 Buff.L.R. 65, 81–82 (1969).

than an ordinary antenna. United Artists Television, Inc. v. *Fortnightly Corporation*, 255 F.Supp. 177 (S.D.N.Y. 1966). Teleprompter makes similar contentions about the numbers of otherwise unavailable channels its subscribers can receive.

The unique aspect of Teleprompter's advertising is its mention of programs originated by the CATV; as will be noted below, the *Fortnightly* systems originated only time and weather scans. We fail to see though how emphasis on its originated programs changes Teleprompter's function. This type of advertising demonstrates, of course, that Teleprompter felt its unique service would be more attractive to consumers if original programs were offered. But if *any change in function occurred be-cause of origination, it was due to the origination itself, not to Teleprompter's advertisement of that fact.

Nor do we find decisive significance in the sale of commercials to accompany Teleprompter's origination of sporting events in New York City. While the Supreme Court described commercial sponsorship as an attribute of a broadcaster, it was listed as merely one of a number of indicia of broadcasting, not as a sole determinant. The sale of commercials in the case before us was small in both the amount of money involved and in relation to the amount of programming carried by the New York CATV. Importantly, these commercials were sold and carried as part of the programming *originated* by Teleprompter, and not in connection with its transmittal of over-the-air broadcasts. Of course, both types of programming were part of the same overall service, and, realistically, some of the audience for the commercials was at least partly attracted to Teleprompter by its "reception service." But the commercials were not inserted in the midst of the received programs, and the sponsor seems to have geared the commercials closely to the originated sports events.

We come now to Teleprompter's importation of distant signals—the re-transmission of broadcast signals that cannot be received on rooftop or tower-mounted antennas. This function is a salient feature of the Farmington, Great Falls and Rawlins CATV's and is also present in Elmira. It is almost certainly responsible for much of the business of the first three of these systems.

Plaintiffs contend that Teleprompter is engaging in broadcasting by bringing signals into a new locale. In plaintiffs' view, importation of distant signals differentiates this case from *Fortnightly*, whose CATV's functioned "merely as an auxiliary antenna to enhance the quality of the television picture . . ." (Plaintiffs' pre-trial brief at 8, 19). Plaintiffs thus urge us to limit the copyright immunity resulting from *Fortnightly* to those CATV's which "enhance" the quality of picture that can already be received in the locale.

A reading of the *Fortnightly* opinions of the District Court, Court of Appeals and Supreme Court reveals that the *Fortnightly* systems did more than "enhance" poor quality pictures—they in fact brought in stations from which usable reception could not be had at all. All of the courts recognized that the *Fortnightly* CATV's carried broadcasts to *additional* viewers.

*Fortnightly* involved two CATV's, one in and around Clarksburg, West Virginia, and another in and around Fairmont, West Virginia, eighteen miles from Clarksburg. Clarksburg is located approximately 82 miles from Pittsburgh, 57 miles from Wheeling, West Virginia, and 74 miles from Steubenville, Ohio—the cities from which it received broadcast signals. Fairmont, which received the same signals, is 67, 52 and 65 miles from those cities respectively. The *Fortnightly* systems had antennas on hills above Clarksburg and Fairmont, connected by coaxial cables to individual subscribers.

District Judge Herlands found that:

"No credible competent evidence was adduced which demonstrated that the residents of Clarksburg or Fair-

mont, other than the subscribers to defendant's systems, could receive a usable and reasonably satisfactory picture from any of the five stations in Pittsburgh, Wheeling or Steubenville." 255 F.Supp. at 186, aff'd 377 F.2d 872, 883 n. 14 (2d Cir. 1967).

Judge Herlands also found as a fact that:

"The basic purpose of defendant's CATV systems . . . is to process and retransmit signals of a television broadcast station to areas in which direct reception by ordinary home antennas of such television broadcast is unsatisfactory because of distance, intervening topographical conditions, or similar factors." 255 F.Supp. at 196.

The Court of Appeals cited Judge Herlands' first finding above in stating that "[t]he hilly terrain in and around Clarksburg and Fairmont makes reception by normal rooftop antennas of television programs broadcast by the Pittsburgh, Steubenville and Wheeling stations difficult or *impossible*." 377 F.2d 872, 874 (2d Cir. 1967) (Emphasis added).

The Supreme Court treated the *Fortnightly* case as one where most residents of the areas involved could not receive broadcasts of other than local stations by ordinary rooftop antennas. 392 U.S. at 391, 88 S.Ct. 2084. It went on to distinguish CATV systems from broadcasters on the ground that the former "receive programs that have been released to the public and carry them by private

channels to *additional* viewers." [9] 392 U. S. at 400, 88 S.Ct. at 2090 (Emphasis added).

It is clear, then, that Teleprompter's importation of signals not receivable on rooftop antennas is no different from that in *Fortnightly*. This case differs from *Fortnightly* in that in a number of the systems the antenna tower receiving the signals is located not on a hill over the city but many miles away in the vicinity of the broadcasting station. Farmington, as we have seen, receives Los Angeles stations whose signals are received off-the-air near their point of origination and relayed by microwave to New Mexico. Does this greater distance alone between the receiving antenna and the CATV station and its customers change the function of the *Fortnightly* reception service? To put the question another way, did the Supreme Court mean to imply a geographical limit beyond which signals could not be imported? Though the Court, of course, was concerned with the system before it, which imported signals from a maximum distance of 82 miles, there is no indication that it intended to imply a geographical limit.[10] In fact, the Supreme Court in *Fortnightly* explicitly declined to make copyright liability dependent on the distance the broadcast signal was carried by a CATV. There the Court said:

"We have been invited by the Solicitor General in an *amicus curiae* brief

9. In United States v. Southwestern Cable Co., 392 U.S. 157, 163, 88 S.Ct. 1994, 1998, 20 L.Ed.2d 1001 (1968), decided a week before *Fortnightly*, the Court stated that CATV systems "may transmit to subscribers the signals of distant stations entirely beyond the range of local antennae."

10. Justice Fortas, in dissent, may have understood the majority to have been impliedly limiting the distance signals could be carried when he wrote:
"It may be, indeed, that insofar as CATV operations are limited to the geographical area which the licensed broadcaster (whose signals the CATV has picked up and carried) has the

power to cover, a CATV is little more than a 'cooperative antenna' employed in order to ameliorate the image on television screens at home or to bring the image to homes which, because of obstacles other than mere distance, could not receive them. But such a description will not suffice for the case in which a CATV has picked up the signals of a licensed broadcaster and carried them beyond the area—however that area be defined—which the broadcaster normally serves." 392 U.S. at 407, 88 S.Ct. at 2093.
It is also possible that Justice Fortas thought that such a geographical distinction *should* have been made by the majority but was not.

to render a compromise decision in this case that would, it is said, accommodate various competing considerations of copyright, communications, and antitrust policy. We decline the invitation.[32] That job is for Con-

32. "The Solicitor General would have us hold that CATV systems do perform the programs they carry, but he would have us 'imply' a license for the CATV 'performances.' This 'implied in law' license would not cover all CATV activity but only those instances in which a CATV system operates within the 'Grade B Contour' of the broadcasting station whose signal it carries. The Grade B contour is a theoretical FCC concept defined as the outer line along which reception of acceptable quality can be expected at least 90% of the time at the best 50% of locations. Sixth Report and Order, 17 Fed.Reg. 3905, 3915. Since we hold that the petitioner's systems did not perform copyrighted works, we do not reach the question of implied license."

gress. We take the Copyright Act of 1909 as we find it. With due regard to changing technology, we hold that the petitioner did not under that law 'perform' the respondent's copyrighted works." 392 U.S. at 401–402, 88 S.Ct. at 2090. (Other footnotes omitted)

Furthermore, the Court's reasoning in *Fortnightly* would not support our creation of a difference between signals received on a local tower and signals received on a distant one. "The effective range of the broadcast is determined by the combined contribution of the equipment employed by the broadcaster and that supplied by the viewer." *Id.* at 398, 88 S.Ct. at 2088. Here, the "viewer" (the CATV system) has, by supplying more sophisticated equipment, enlarged the effective range of the broadcast, just as the CATV in *Fortnightly* enlarged the range of broadcasts with its tower on a hill. The Court's description of a CATV in *Fortnightly* is equally apt for this case: "Essentially a CATV system no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's set." *Id.* at 399, 88 S.Ct. at 2089.

What Teleprompter has done is to make its antenna even more "well-located" and even more "efficiently" connected to a viewer's set than in *Fortnightly*.

If a viewer erected an antenna on a hill, the Court said, he would not be performing the programs he received. *Id.* at 400, 88 S.Ct. 2084. Nor, it would seem, would a viewer be "performing" if he set up a strategically-placed antenna miles from his home and brought in signals from that antenna. The fact that the same operation is conducted here as a commercial enterprise by a viewing innovator does not change its function— which is to "enhance the viewer's capacity to receive the broadcaster's signals." We therefore find that Teleprompter's importation of distant signals does not cause it to function as a broadcaster.

Plaintiffs contend that the importation of distant signals allows defendants greater latitude in program selection and that this latitude make them more like broadcasters than viewers. We have found that Teleprompter's practice of importing distant signals allowed it to exercise discretion in choosing which distant signals to import. It is not clear from the record what freedom the *Fortnightly* systems had to select the broadcast stations they would carry. Because they received broadcast signals on a single antenna located near the area it served, the *Fortnightly* CATV's had less control over program selection than CATV's that would mount antennas near selected broadcast stations in other cities. But though Teleprompter has greater freedom of choice than *Fortnightly* its latitude is not comparable to that of a broadcaster, which controls program content and scheduling.

Perhaps the most striking difference between this case and *Fortnightly* is Teleprompter's program origination. The *Fortnightly* CATV's transmitted messages by video scanner and no more. 255 F.Supp. at 197. The Supreme Court in *Fortnightly* did not find this meager origination of significance, and explicitly excluded from consideration CATV

systems originating their own programs. 392 U.S. at 392, 88 S.Ct. 2084, n. 6.

Due to the development of the CATV industry, we are here squarely faced with CATV systems that do originate a substantial amount of their own programming. We have found that all the CATV's originate "automatic" transmissions around the clock, and all originate substantive programs to some degree, ranging from a few hours a week in Elmira to seventy hours a week in New York as of March 31, 1971. We have also found that the content of these shows is not significantly different from those of ordinary broadcast stations. As far as we can tell, the volume and variety of program origination by CATV will probably increase in the future. In fact, though we need not decide if it is a defense to potential copyright liability as defendants urge, it is worth noting that the Federal Communications Commission does require non-automatic program origination by most CATV systems. 47 C.F.R. § 74.1111 [11]

We do not doubt that Teleprompter's program origination is similar to that done by broadcasters. These CATV's select the programs, propagate them, and have control over program content and arrangement. Teleprompter's New York system sells commercials for a portion, albeit small, of its originated schedule. Certainly New York originates at least as many hours of programming as many local broadcast stations. With respect to its program origination Teleprompter is functioning as a broadcaster.

We are thus faced with the question of whether a CATV's function as a broadcaster with respect to program origination affects the nature of the function it performs in receiving and re-transmitting over-the-air broadcasts. We are of the opinion that the copyright liability for the "reception service"

should not be affected by what can be considered an unrelated function—program origination. It is true that the originated programs and the received programs are sold to subscribers as a package; nobody buys one without the other. But the nature of the function of a CATV with respect to received shows is not changed by the presence of original material on other channels or at other times. What Teleprompter is doing to plaintiffs' copyrighted material, and other over-the-air broadcasts, is the same whether the CATV's originate programs or not. The "function" of the reception service is not changed by simultaneous sale of original shows, just as it would not be changed by Teleprompter's simultaneous delivery of free ice cream or candy to every subscriber.

Having examined the separate activities which plaintiffs feel put defendants on the broadcaster's side of the line, it may be appropriate to look at defendants' systems as a whole. It is somewhat difficult to apply either the term "viewer" or "broadcaster" to the CATV systems in their entirety in this case. As we have already seen, these CATV's perform two functions: 1) delivery of the signals of over-the-air broadcast stations, and 2) transmission of original television programs. It often cannot fairly be said that one is the predominant function. The service sold by Teleprompter is the combination of these functions, not either in isolation.

Beyond the "functional test" we have discussed at length and attempted to apply, it may be that the lesson of *Fortnightly* is, as the Eighth Circuit Court of Appeals says in another context: "broadcast signals are dedicated to the public." Midwest Video Corp. v. United States, 441 F.2d 1322, 1326 (8th Cir. 1971), cert. granted, 404 U.S. 1014, 92 S.Ct. 676, 30 L.Ed.2d 661 (1972).[12] Cer-

---

11. Teleprompter argues that to find copyright liability because of program origination demanded by the F.C.C. would be unconscionable. *Cf.* Farmers Union v. WDAY, 360 U.S. 525, 531, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959).

12. It has been observed that this result is quite similar to that which would follow from defendants' license-implied-in-law argument. Comment, *supra*, note 8, at 79–80.

tainly, that is one conclusion that can be drawn from the Supreme Court's first finding that the range of a viewer is determined by the equipment of both the broadcaster and the viewer, and then analogizing a CATV to a viewer's antenna. For if a CATV is like a viewer and a viewer by his choice of equipment can determine the range of a broadcast, then there seems to be little limit to what can be done with broadcast signals by CATV's. The result indeed may be that "the right to receive and distribute [signals] may be exercised by any one with the capacity to capture the signals." *Id.* at 1326–1327.

It should be remembered that our task here is to decide whether what defendants do infringes plaintiffs' exclusive rights under the Copyright Act of 1909, 35 Stat. 1075, as amended, specifically § 1, 17 U.S.C. § 1, by "performing" plaintiffs' copyrighted works. In construing the Copyright Act in the years since 1909 the courts have built on the basic analogy of the producers of a stage play and their audience; the producers perform the play, the audience does not. See 392 U.S. at 395, 88 S.Ct. 2084 n. 15. This metaphor was then analogized to the dichotomy between a listener and a broadcaster, see e. g. Jerome H. Remick & Co. v. American Automobile Accessories Co., 5 F.2d 411 (6th Cir. 1925); Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 201, 5 S.Ct. 410, 75 L.Ed. 971 (1931), which in turn was used as a model for differentiating a broadcaster from a noninfringing CATV in *Fortnightly*. We have here carried this analogy yet another step by comparing the instant CATV's with those in *Fortnightly*. Undoubtedly, future technological change, drastic and otherwise, will see the courts asked to take further steps. Perhaps the time has come to cease piling analogy on analogy and to await word from Congress.

The copyright monopoly is "wholly statutory", White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 15, 28 S.Ct. 319, 5 L.Ed. 655 (1908), and we should perhaps be reluctant to expand an exception to the general disfavor of monopolies in the absence of a more precise expression of Congressional intent, particularly in light of the considerations of national communications policy that Congress may want to bring to bear on the CATV industry.

In any case, taking the law in its present state, we find that the CATV's before us do not function as broadcasters within the meaning of the *Fortnightly* test, that they therefore do not "perform" plaintiffs' works, and hence do not infringe their copyrights. We, of course, do not reach any of defendants' arguments other than those considered above.

Settle order on five days' notice.

The issue in *Midwest Video* is whether the Federal Communications Commission has the power to require existing cable television systems to originate programming.